## FOX v. STATE.

Opinion delivered February 26, 1912.

1. FALSE PRETENSES—SUFFICIENCY OF INDICTMENT.—An indictment for false pretenses is sufficient which alleges that accused, with intent to defraud, falsely represented to the prosecuting witness that a third person was indebted to accused as evidenced by a note and mortgage, that by means of such representation the prosecuting witness was induced to become surety for accused, and that the representation was false and known to accused to be false. (Page 453.)

2.  FALSE PRETENSE—WHAT CONSTITUTES.—It is not sufficient to constitute an offense within the meaning of the statute to obtain goods or things of value with the intent to defraud, but it must be accomplished by a false pretense; and, although the pretense used was believed by defendant to be false, he will not be guilty if it turns out not to be false. (Page 458.)

3.  BILLS AND NOTES—BONA FIDE HOLDER.—Where a promissory note was indorsed before maturity to one as collateral security for his indorsement of a similar note, he became a *bona fide* holder, and entitled to the protection of an indorsee. (Page 459.)

4.  SAME—BONA FIDE HOLDER OF ACCOMMODATION PAPER.—The *bona fide* holder for value of accommodation paper, taken in regular course of business, may enforce it against the maker, although he knew when he received it that it was accomodation paper. (Page 460.)

Appeal from Polk Circuit Court; *Jefferson T. Cowling,* Judge; reversed.

*Wright Prickett* and *Elmer J. Lundy,* for appellant.

1.  The indictment is insufficient, and the demurrer should have been sustained. Kirby's Digest, § § 1689, 2230; 163 Ind. 628; 70 N. E. 600; 58 Ark. 43; 94 *Id.* 242; 70 *Id.* 30; 42 *Id.* 131; 38 *Id.* 523; 118 Ind. 491. The language is not sufficiently definite. Cases *supra;* 95 N. E. 768.

2.  The evidence is not sufficient, and there was error in the admission of evidence. The indictment charges two offenses. 70 Ark. 30; 37 *Id.* 443; 80 *Id.* 94; 60 *Id.* 141; 80 *Id.* 285.

3.  Intent is the gist of the crime of false pretense. Hughes, Inst. to Juries, § 830; Underhill on Cr. Ev. § § 436-7; 4 El. on Ev. § 2975; 111 Ala. 40; 20 So. 629; 5 Enc. of Ev. 744. There must be an intent to defraud *at the time.* 12 Am. & Eng. Enc. Law (2 ed.), 824-5; 61 Ark. 157; 54 Ark. 481; 141 Mass. 423; 20 Tex. App. 592; 54 Am. Rep. 530.

4.  The peremptory instruction for defendant should have been given. The alleged false representations of defendant are entirely unconnected with any act of defendant. 61 Ark. 157-188. See further 54 Ark. 481; 141 Mass. 423; 20 Tex. App. 592; 54 Am. Rep. 530.

*Hal L. Norwood,* Attorney General, and *Wm. H. Rector,* Assistant for appellee.

1.  The indictment is good under § 1689, Kirby's Digest.

2.  The evidence supports the verdict—it is ample.

3.   The instructions do not ignore the *intent.*   The word "fraudulently" conveys the idea that the representations must have been made with intent to cheat and defraud.   95 Ark. 60, and cases cited;   48 Ga. 192;   98 Ind. 335;   7 Fed. 622; 38 N. W. 509;   74 Ia. 602;   66 Ga. 715;   84 Mo. 666;   71 Pac. 860; 66 Kan. 447;   77 Ala. 357;   54 Am. Rep. 60.

KIRBY, J.   Appellant was convicted in the Polk Circuit Court upon an indictment, charging him with obtaining the signature of one T. M. Dover by certain false pretenses.

The sufficiency of the indictment was challenged by general demurrer, in which it was also alleged that it was bad for duplicity.

The indictment is long and involved, and is by no means a model of good pleading, but it alleges in apt terms that defendant "unlawfully, falsely, fraudulently, feloniously and designedly, with the intention then and there to cheat and defraud, did falsely represent and pretend to him, the said T. M. Dover, that one H. G. Gray was justly indebted to the said J. M. Fox, etc., and the said J. M. Fox did then and there falsely, fraudulently, feloniously, and designedly, with intention then and there to cheat and defraud, * * * represent and pretend to him, the said T. M. Dover, that the said mortgage and note aforesaid represented and was security for a good and valid and *bona fide* indebtedness, · * * * and by means of which said false and fraudulent representations and pretenses as aforesaid the said J. M. Fox then and there induced the said T. M. Dover to become surety for the said J. M. Fox for the sum of one hundred dollars, * * * and the said T. M. Dover, then and there relying upon the representations and pretenses as aforesaid, did then and there become surety for the said J. M. Fox on a certain promissory note for the sum of one hundred dollars, * * * the said representations and pretenses as aforesaid were false and were known to be false by the said J. M. Fox at the time they were made, and by means of which said false and fraudulent representations and pretenses as aforesaid he, the said J. M. Fox, did then and there unlawfully, falsely, fraudulently, feloniously and designedly, with intention then and there to cheat and to defraud, * * * did obtain from him, the said T. M. Dover, his signature and indorsement as surety   * * *.''

We think it is sufficiently alleged that the pretenses made were false and known to be so by appellant, and were made with the fraudulent intent to deceive the injured party, Dover, and secure his signature and indorsement to the note, upon which the money was procured from the bank, and which said Dover afterwards had to pay, and that he was induced thereby to make such signature and indorsement.

It is true that there are many other allegations in the indictment relative to procuring the money from Dover and the Bank of Hatfield, but we do not think the indictment is open to the charge of duplicity, and any other allegations not necessary to the charge of obtaining the signature of Dover by the false pretenses alleged were properly treated as surplusage by the lower court in overruling the demurrer.

The evidence tends to show that one Bud Gray, desiring to secure the payment of his indebtedness to T. M. Dover, and to secure a certain and further sum of money from him, executed to him the following note:

"$300.00.                    Hatfield, Ark., June 15, 1910.

"Ninety days after date, I promise to pay to J. M. Fox, or order, at Hatfield, Arkansas, three hundred ($300.00) dollars for value received, negotiable and payable without defalcation or discount, with interest from date at the rate of 10 per cent. per annum; this being the mortgage note from H. G. Gray to J. M. Fox conveying the following described property towit: one bay horse mule ten years old, fifteen hands high, named Pete, one bay mare mule nine years old, fifteen hands high, named Kit, one new three-inch Springfield wagon, on which property a vendor's lien is retained to secure payment of this note.                    (Signed) "H. G. Gray."
Due 15th September.
No.........................................P. O. Hatfield.
Indorsed on back:
June 18-10.

"I hereby authorize T. M. Dover as my agent to foreclose the accompanying mortgage to this note at maturity.
                    (Signed) "J. M. Fox."
—securing same by a mortgage upon certain property described in the note, which was duly executed by the said Gray upon the same date that the said Dover went first to the Bank of Hat-

field, and presented the mortgage and note, and asked if he could procure a loan upon it, telling the cashier at the time about the value of the property. The cashier suggested that he go and see Dover and get his indorsement on the note, and he would lend him the hundred dollars he desired. He then went to Dover to procure his signature to the note, and the transaction was stated by Dover as follows:

"I am acquainted with H. G. Gray, commonly called Bud Gray, and J. M. Fox. About June 15, 1910, I lived in Hatfield, and was engaged in the mercantile business. In June I signed a note as security with J. M. Fox, as principal, to the Bank of Hatfield for $100, as follows:

"'$100.00.                    Hatfield, Ark. June 18, 1910.

"'Ninety days after date, for value recived, I, we, or either of us, promise to pay to the order of the Bank of Hatfield, Hatfield, Ark., one hundred dollars, negotiable and payable, without defalcation at the Bank of Hatfield, Hatfield, Arkansas, with interest at the rate of ten per cent. per annum from maturity until paid.

"'The drawers and indorsers severally waive presentment for payment, protest and notice of protest and nonpayment of this note.

"'Due 8-18-10 No. 12.          ·                    J. M. Fox.
"Post Office Hatfield."

Indorsed on back:                                 T. M. Dover.
"10-17-10.   Paid by T. M. Dover, $100.85.
          "E. R. Bryant, Cashier."

"He came to my place on the 18th of June with the note and mortgage, just he and I together, and he showed me the note and mortgage, and said he wanted to turn them over to me to secure me to go on his note at the Bank of Hatfield for $100. I asked him if Bud Gray owed him $300, and he said he did. He went on and told me what he owed it for, but I don't remember what that was. I first doubted him owing it at the start until he told me what he owed it for, and then I finally decided that it would be good to secure the $100, if that was true what he told me. I told him if he owed him that, and it was correct, that would be enough to secure me to go on his note for one hundred dollars. He turned the note right over there in the warehouse, and wrote on the back of it (referring to the indorse-

ment on the back of the note due him by H. G. Gray, dated Hatfield, Arkansas, June 15, 1910). This is his writing on the back of the note which he wrote on the 18th day of June.

"Q. Now this was done after you told him you would sign the note with him if he would make you his agent and turn over the note to you? A. Yes, sir. This is the mortgage that accompanied the note for three hundred dollars. The purpose of making me his agent and turning over the note to me was so I could foreclose the note at maturity and make my money out of the property in question, in case he didn't pay the note at the bank. He didn't pay the note, and I had to pay it. I notified him the note was due, and I got no answer from him, and in a few days he left the country. After he left, I kept on his trail all through Oklahoma. When I found out that he had left the State, I notified Gray that his mortgage was due, and to come down and make some arrangement, or I would have to foreclose it, and he came down to Hatfield, and asked if it had not been paid, and I told him it had not.

"The mortgage is the usual form of chattel mortgage. It recites the consideration due of three hundred dollars, and for other money, goods, wares, etc., furnished by the party of the second·part to the party of the first part, up to the foreclosure of the instrument signed on the 15th day of June, by H. G. Gray and acknowledged by him before W. J. Davis, a justice of the peace.

"I called on Gray for the property, and he refused to give it up, and I replevied it under the mortgage. He took a change of venue to Mena, and I found out that it was not his property and withdrew the suit. I found out it belonged to his wife. I didn't pursue the case any further, but commenced to try to catch Fox in Oklahoma. Fox gave H. G. Gray a check or half the money he realized on the note I indorsed on the same day I signed it. We didn't have a trial on the replevin suit for this property. I found out it was not his property, and withdrew the suit. We took Bud Gray's affidavit, which was filed in the court. I don't remember whether Fox told me that part of what Gray owed him for was for $135 worth of timber or not. He told me $300 worth of stuff that Gray owed him, but I don't remember what he told me the $300 worth of stuff was. I don't know how much Gray owed Fox. All If

know was what Fox told me when he brought that note and mortgage. I thought all the time it was Bud Gray's team, and never heard it called any one else's until the suit came up."

Bud Gray testified as follows: "I remember executing the note and mortgage for $300 to J. M. Fox in June of last year, about the 15th of June, I believe, that I let him have it. This matter was talked over at Hatfield. I was not due Fox $300 when I signed the note and mortgage. I think I was due him about $30. I knew at the time I executed this mortgage and note I was only due him that amount. I don't think the matter was discussed between me and him as to how much I owed him. I sold Fox some timber, and was to get $125. He paid me about all of it in money, groceries and goods. It might have been as much as $177.75 that he paid me. He got part of the timber, and sold the remainder to Spencer. Spencer didn't get this lumber, and there was some that he didn't cut, and I agreed to pay Fox back. We never had any permanent settlement, and I owed him at the time the mortgage was made, about $28 or $30."

The defendant testified: "Gray came to my mill and wanted me to go to Mena and help him raise some money to buy some cattle, was about the first part of the transaction. I told him I was busy, and could not go. He came back two or three days after that, and wanted me to go to Mena with him and help raise some money. He said about fifty or seventy-five dollars would do him, and that he would give me a mortgage on his mules and wagon to secure me for that much. I told him if he would give me a mortgage on his mules and wagon, and make me a note sufficient to cover what he already owed me and the amount he wanted to borrow, I would make an effort to get it for him. We didn't come to Mena. I told him we would go over to Hatfield. We went over to Hatfield, and he executed the note and mortgage before Squire Davis. I went to see Mr. Dover, and told him what I wanted, and asked him if this security would be good for that amount. He said he didn't believe the mules were worth $300, but said the mules and wagon were. I then asked him if he would be willing to go on my note for $100 and take the note and mortgage as security. A note was then executed by me and Dover on the 18th day of June. Bud Gray owed me at the time this note

and mortgage was made $177.75. I bought timber to the amount of $125.00 from him. He also got groceries and other goods at the commissary. The account was $177.75. I sold the timber to Spencer Lumber Company, but Spencer didn't get the timber, and after they didn't I had a conversation with Bud Gray, and asked him why he had stopped Spencer Lumber Company from cutting the timber. He said he was on a deal to sell the place, and they would not buy the place if the timber was cut off, and he believed it would damage the place more than he was getting out of it to have it cut, and he decided, if it was agreeable to me, to pay me back what I had paid on the timber, and I told him if he did that it would be all right. This was about the 10th of June, and the mortgage was executed about ten days later. This was part of the consideration for the note and mortgage, and the balance was that I was to furnish him more commissaries and get the money at the bank, with the understanding that his account would not exceed $300, including the money which I got at the bank for him. I just carried the note and mortgage to Dover and asked him if he thought it was good security for a loan of $100, and after he looked it over he said it was. I have had lots of business dealings with Dover, more than a thousand dollars a year, during the two years previous, and have owed him as much as a thousand dollars at one time. I did not tell Dover Bud Gray owed me $300. I told him Bud Gray owed me for timber and a lot of other goods I had furnished him."

There was other testimony introduced as to the defendants going to Oklahoma; his arrest there for the alleged offense and refusal to return, and his second arrest and return to the State. Also a good deal of testimony in explanation of his actions after the payment of the indorsed note by Dover, which might have tended to show that he had no interest in the collection of the $300 note, beyond the amount for which it was pledged as collateral.

It is insisted that the verdict is not sustained by the evidence, and that the court should have given the peremptory instruction for appellant, and we have concluded the contention is correct.

It has already been held by our court that it is not sufficient to constitute an offense within the meaning of the statute to

obtain goods or things of value with the intent to defraud, but that it must be accomplished by a false pretense; and, although the pretense used was believed by the person to be false, it will not be sufficient to constitute the offense, if it turns out in fact not to be so. *State* v. *Asher*, 50 Ark. 430.

So here, by the terms of said section 1689, Kirby's Digest, with the violation of which appellant is charged, the pretense or writing designedly used to obtain the signature to the instrument must be false. The false pretense charged herein is Fox's representation that the $300 note of Gray, payable to his order, secured by the mortgage upon the personal property, represented a *bona fide* indebtedness. Unless such representation was false, it furnishes no foundation for a prosecution against Fox. The testimony shows that Gray voluntarily executed the note sued on, as presented to Dover for security, and the mortgage accompanying it. That he did not, at any time before payment thereof was demanded of him by Dover, after he had been required to pay the $100 note he indorsed for Fox to the bank upon the faith of the security thereof, contend that it did not represent a valid debt, and after said demand only contended that he did not owe more than $25 or $30 at the time of its execution. Fox stated that Gray was indebted to him at the time the same was executed for $177.75, on account for groceries, and for a balance on a hundred and twenty-five dollar timber claim; and that he agreed to let him have fifty dollars more in order to procure Gray's note and security for the amount already owing him, and the money and supplies thereafter to be furnished, up to the amount of the note taken, $300.

There was no testimony tending to show that Fox knew, at the time he procured the signature and indorsement of Dover to the $100 note negotiated at the bank, that the property mortgaged by Gray to secure the $300 note was not owned by him, if such is the fact, or that he made any representation to Dover that the property included in the mortgage belonged to the mortgagor, nor is he charged with having made such representation.

The note, if it be regarded as accommodation paper merely, was, by its terms, negotiable, and, having been delivered before maturity to Dover, as collateral security for his indorsement

of the $100 note, it was a valid obligation, binding upon the maker, and constituted Dover a *bona fide* holder thereof, and entitled him to the protection of an indorsee. *Brown* v. *Callaway*, 41 Ark. 418; *Winship* v. *Merchants Bank*, 42 Ark. 22.

"The *bona fide* holder for value of accommodation paper, taken in the regular course of business, may enforce it against the maker, although he knew when he received it that it was accommodation paper." *Evans* v. *Speer Hardware Co.*, 65 Ark. 204. See, also, *Exchange National Bank* v. *Coe*, 94 Ark. 387; Daniel on Negotiable Instruments, § 793a, vol. 1.

It follows that, since the $300 note of Gray was and is as binding and valid in the hands of Dover against its maker as if it had in fact represented a *bona fide* indebtedness for that amount, it could not constitute a false pretense within the meaning of the statute, the representation made being in effect true; and no offense was committed by the representation made and securing the signature of Dover to the $100 note on account of it.

Dover got the security he thought he was getting, so far as the representation made by appellant at the time of securing his signature that the $300 note represented a *bona fide* indebtedness was concerned; and, while the evidence indicates that the security has proved worthless on account of Gray not being the owner of the property he mortgaged to secure the $300 note, it was not brought about by any false representations alleged to have been made in the securing of the signature.

The judgment is reversed, and the cause dismissed.